## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENISE KING, | ) | |
| | ) | No. 2:20-cv-01032 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| MICHAEL BAKER INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

Robert J. Colville, United States District Judge,

Plaintiff Denise King initiated this action after Defendant Michael Baker International ("MBI") terminated her from her position in MBI's tax department. King asserts that MBI terminated her for taking protected medical leave due to her disability in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA"), and due to her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the PHRA.

Before the Court is MBI's Motion for Summary Judgment (ECF No. 38). The motion is fully briefed and ripe for decision. As discussed below, I find that there are no disputed issues of material fact suitable for trial. Accordingly, I will GRANT MBI's motion and enter judgment as a matter of law in favor of MBI.

I.      **BACKGROUND**

    **A.  Factual Background[1]**

        **1.  MBI Hires King as a Tax Manager**

In November of 2015, MBI hired King as a Tax Manager in its tax department.  Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J. ¶ 44 (ECF No. 40) ("Def.'s SOMF").  At that time, the tax department included two employees: an Associate Vice President and Tax Director, Gregory Smay; and another Tax Manager, George Heron.  *Id.* ¶¶ 35, 38, 45. Smay joined MBI in 2000 and began overseeing the tax department as director in 2009 or 2010. *Id.* ¶¶ 37–38.  Heron joined the tax department in 2007 and was primarily responsible for the corporate tax returns.  *Id.* ¶ 40.

At some point, although the record does not specify, King began experiencing symptoms including fatigue and dizziness due to sarcoidosis.  Because she was experiencing these symptoms, at some point in early 2016, King requested the ability to work from home.  *Id.* ¶¶ 156–57.  Her request was granted, and King worked from home one to two days per week from early 2016 until her termination in August 2019.  *Id.*

In addition to other duties, King was responsible for the completion of tax returns for pass-through entities that were owned or controlled by MBI.  *Id.* ¶¶ 47–48; Pl.'s Response to Def.'s Concise Stmt. Of Material Facts and Counterstatement of Material Facts ¶¶ 47–48 ("Pl.'s SOMF"). King testified that, when she started at MBI, she "prepared the tax returns for the pass-through entities, prepared quarterly estimated tax payments," performed "other projects," and "would help with the tax provision calculations and anything else that Greg [Smay] needed help with."  Def.'s App'x in Supp. of Mot. for Summ. J., Ex. B at 52:20–53:3 (ECF No. 41) ("Def.'s App'x").  Indeed, Smay testified that he interviewed King and found that she "was a good fit" at least in part based

---

[1]      Unless otherwise noted, these facts are not in dispute.

on her "LLC experience."  Def.'s App'x, Ex. A at 14:18–15:5.  Heron, the other Tax Manager, was responsible for the tax returns for incorporated entities.  Def's App'x, Ex. B at 53:9–15.

When King was hired, MBI had approximately 8 operating pass-through entities bringing in close to $300 million in revenue annually.  Def.'s SOMF ¶ 51.  However, after MBI sold several of its businesses, the amount of pass-through revenue decreased from $300 million to nearer $3 million.  *Id.* ¶ 52.  By the end of 2018, because of this decrease in pass-through revenue, King's existing responsibilities were no longer full-time.  *Id.* ¶¶ 53–54; Pl.'s SOMF ¶ 53.

In January 2019, King was told that she would be given additional responsibilities, including responsibility for what the parties call "indirect taxes."  Def.'s SOMF ¶¶ 54–55; Pl.'s SOMF ¶ 55.  These indirect taxes included sales and use taxes, personal property taxes, business privilege taxes, and business licenses.  Def.'s SOMF ¶ 55.  Several people in different, non-tax departments within MBI had previously handled the indirect taxes.  *Id.* ¶ 59–60.  Additionally, King was tasked with monthly sales tax reports and monthly accruals.  *Id.* ¶ 56.  King began handling these additional responsibilities on March 1, 2019 and continued to do so until she was terminated.  *Id.* ¶¶ 57.

### 2.   MBI Begins Exploring Opportunities to Restructure the Tax Department

In September or October 2018, MBI hired Amy Davis as Senior Vice President, Chief Accounting Officer, and Treasurer.  *Id.* ¶ 3.  From the beginning of her tenure, MBI tasked Davis with evaluating the finance department.  *Id.* ¶¶ 6, 103.  As part of that process, Davis began interviewing accounting firms to review and assess MBI's tax returns and identify opportunities for greater efficiency.  *Id.* ¶ 107.  In a December 6, 2018, email to Carl Grande, a partner at the firm Ernst & Young ("E&Y"), Davis indicated that she was ultimately looking to "assess whether [her] current structure is cost effective and whether [MBI] would be better served to utilize a firm to do some or all of our work."  *Id.* ¶ 106; *see also* Def.'s App'x, Ex. I.

MBI hired E&Y to conduct a review of MBI's finance department in December 2018. Def.'s SOMF ¶ 108.  Shortly thereafter, MBI set up a SharePoint site to collect documents for the review, which commenced in late January and took approximately four weeks.  *Id.* ¶¶ 109, 111. As part of this review, King submitted information to E&Y, including an estimation of the time she spent on the various aspects of her job *Id.* ¶ 110.  King asserts that she was not aware of the purpose of E&Y's assessment.

E&Y presented its findings to MBI on February 20, 2019.  *Id.* ¶ 111.  In E&Y's presentation, it identified the opportunity for MBI to save $1.3 million in taxes by filing amended returns.  *Id.* ¶ 110.  The parties agree that this $1.3 million in savings was attributable to the corporate returns that were being prepared by Heron, although they take divergent positions on whether the savings were possible because Heron made mistakes on the corporate returns or because E&Y had merely identified different positions that MBI could take on the returns.  Davis met with E&Y partner Carl Grande in late March and asked him to put together proposals for a co-sourcing arrangement.  *Id.* ¶ 113.  Grande emailed Davis on April 7 to inform her that he was "pulling everything together" and that he "should have an update to share with" her in two days. *Id.* ¶ 114; *see also* Def.'s App'x, Ex. H at 1.

On April 9, Grande sent a PowerPoint outlining a new "Proposed Tax Operating Model" which would restructure the tax department to include Davis as Chief Accounting Officer and Treasurer, Smay as Vice President and Global Tax Director, and an unidentified Tax Analyst who would report to Smay.  Def.'s SOMF ¶ 115; Def.'s App'x, Ex. H at 19.  In the presentation, E&Y observed that: (1) MBI's "[o]rganization and responsibility [had] changed significantly over [the] prior three years;" (2) "[s]ignificant time" was being "spent on data gathering and data transformation by manager level personnel;" and (3) "[c]o-sourcing compliance and provision can

result in savings in software costs, overall tax function costs, and result in a redeployment of resources providing more value to" MBI.  Def.'s App'x, Ex. H at 19.  E&Y also observed that a transition could "occur quickly" and that MBI had the opportunity "to recognize process changes in 2019."  *Id.*  According to E&Y, the new structure would result in substantial cost savings.  Def.'s SOMF ¶ 116.  Davis and Smay each testified that the decision to restructure the tax department, including by eliminating the two Tax Manager positions, was made in "March/April 2019."  *Id.* ¶ 117.

On June 13, 2019, Davis sought approval from MBI's ownership, DC Capital, of the restructuring and co-sourcing arrangement proposed by E&Y.  *Id.* ¶ 120.  In an email to Doug Lake of DC Capital, Davis explained the potential efficiency-gains of E&Y's proposal:

> After several discussions with [E&Y] we have landed on a co-source arrangement whereby they will provide assistance with ongoing tax planning, provision streamlining and all compliance work and our team will consist of a smaller group who will work on indirect taxes and quarterly/annual provision process and ad hoc research projects, as well as, work closely with [E&Y] on tax planning opportunities.  The overall impact of the proposal was we will add the additional strength of [E&Y] at our fingertips and save ~$130–$160k/year over our current costs.
>
> In addition, the state lookback review identified $1.3M of cash tax savings opportunities through positions we were able to take and are supported by [E&Y].  These positions will be filed on amended returns no later than June 30, 2019 (some amended returns have already been filed) and we expect to receive the refunds starting in Q4 2019-Ql 2020.  The ability to identify these savings in a short lookback review underscores the importance of having bench strength to work in tandem with a smaller team at Baker to be more effective in our approach on a regular basis, and not just when periodic lookbacks are performed.
>
> The co-source arrangement will require eliminating two of our senior tax accountants and hiring a staff tax analyst to support Greg.  Our internal group will then consist of two full time people with [E&Y] providing all other support.  I anticipate that the transition will be complete by mid-August.

Def.'s App'x, Ex. C at Ex. 14.

As a result of the proposed restructuring, MBI planned to eliminate both King's and Heron's positions as Tax Managers.  *Id.* ¶ 123.  The restructuring would leave only lower-level tax work (i.e., the indirect taxes) to be handled by the remaining tax analyst.  *Id.*  King was never given notice of the plan to eliminate her position.

### 3.  MBI Hires William Pirilla into a Hybrid Tax/Government Compliance Position

In early May 2019 (although the parties dispute the exact date) someone at MBI posted a position for a senior government compliance analyst to work in the government compliance department.  Def.'s SOMF ¶ 70; Pl.'s SOMF ¶ 70.  The following month, as part of the restructuring efforts, Smay posted a position for a tax analyst in the tax department.  Def.'s SOMF ¶ 73.  On June 18, Smay sent five resumes that had been submitted for the tax analyst position to King and Heron for their review.  Def.'s App'x, Ex. A at 53:2–12; Supplemental App'x in Supp. of Def.'s Mot. for Summ. J., Ex. H (ECF No. 54) ("Def.'s Supplemental App'x").  King responded by identifying three potential candidates for the position.  Def.'s Supplemental App'x, Ex. I.

William Pirilla became aware of the opening in MBI's government compliance department that had been posted sometime in early May through his brother, an employee at MBI.  Def.'s App'x, Ex. D at 10:20–11:5.  Pirilla, who then worked at E&Y, sent a resume to his brother to "feel out" the position.  *Id.* at 12:3–9.  However, before he could apply, Pirilla was informed that MBI's needs had changed, and a hybrid position had been created that would include both tax and government compliance responsibilities.  *Id.* at 10:20–11:5.  After expressing his interest in the hybrid position, Pirilla was interviewed by Smay and MBI's Controller, Adam Phillips.  Def.'s SOMF ¶ 77.

Davis testified that Pirilla's interest in government compliance and experience in tax presented MBI with "an opportunity to get even more efficient" by combining the open tax and compliance positions.  Def.'s App'x, Ex. C at 20:24–22:8.  She did not consider either of the Tax Managers for the position because "their skill set and background was primarily in [tax] compliance" (i.e., filing tax returns) and the new role would not include compliance.  *Id.* at 19:2–21.  Smay testified that the hybrid position was an "entry level" position for which King would have been "overqualified."  *Id.*, Ex. A at 25:4–8, 33:10–12.  Davis also testified that, "absent [Pirilla's] specific desires to expand his skill set and to apply for that government compliance role," MBI would probably not have combined the tax and government compliance roles.  *Id.*, Ex. C at 22:4–8; *see also id.* at 55:10–19; Def.'s SOMF ¶ 78.

In July, MBI hired William Pirilla as a Senior Tax and Government Compliance Analyst. Pirilla began working in the hybrid tax and government compliance position in August.  Def.'s SOMF ¶ 80.  When he started, his salary was $95,000 per year and was divided roughly evenly between the tax and government compliance departments.  *Id.* ¶ 81, 85–86.  Pirilla testified that his initial direct supervisors were Smay and a government compliance manager named Milton Detty.  Def.'s App'x, Ex. D at 12:20–24.

Pirilla understood that his position would be approximately a "50/50 split" between tax and government compliance work.  *Id.* at 15:22–16:1.  When wearing his tax hat, Pirilla worked on the indirect taxes.  Def.'s App'x, Ex. A at 68:21–22.  Pirilla was not responsible for preparing tax returns for pass-through entities, as MBI's tax compliance work had been outsourced to E&Y.  Def.'s SOMF ¶ 82.  When wearing his government compliance hat, Pirilla explained that his primary responsibility was categorizing different company expenses that might be permissible to be charged to MBI's government clients as part of MBI's "overhead rate."  Def.'s App'x, Ex. D

at 16:2–18.  The government compliance work that Pirilla performed also required some "very low-level legal research."  *Id.* at 16:23–17:1.

### 4.  King's Use of FMLA Leave

On March 28, 2019, King applied for intermittent FMLA leave.  Davis and Smay became aware that she had applied for intermittent FMLA leave when they received an email from HR on August 4, 2019.  Def.'s SOMF ¶ 149.  Unum, an insurance provider, had sent a notice of King's intermittent leave "from March 29th, 2019, through October 4th, 2019."  Def.'s App'x, Ex. A at 50:1–7.  Smay testified that he could not recall King taking intermittent leave, but that "she could take off when she needed to."  *Id.* at 50:11–15.

In July of 2019, Smay sent an email to Davis expressing his frustration that King was not further along with a specific tax return.  Pl.'s App'x, Ex. 17 at 1–2.  Smay noted that, because the department was behind, he had worked on the return himself.  *Id.* at 2.  He suggested that the situation "may present an opportunity to get [E&Y] in the door" early and noted that he had reached out to Carl Grande to ask that a staff person be made available.  *Id.*  Davis approved Smay's plan to bring in a staff person from E&Y.  *Id.* at 1.  Regarding King, Davis wrote that "[w]e need to transition to [E&Y] as soon as possible" because she did not "see things getting better with [King]."  *Id.*  Davis testified that she was concerned that the department would continue to fall behind, that the decision to transfer the compliance work to E&Y had already been made, and that there was "really no reason to delay it and put [MBI] at any risk[.]"  Def.'s App'x, Ex. C at 44:6–45:14.

Sometime during the summer of 2019, Debbie Bridgman (an employee in the government compliance group) was brought in and asked to assist with the indirect taxes.  Def.'s SOMF ¶ 90. King testified that Smay told her to show Bridgman "everything you do."  Pl.'s App'x, Ex. 1 at 129:16–22.  However, King understood that Bridgman would only be taking over the indirect tax

8

function because Bridgman lacked the experience and qualifications necessary to complete the more complex pass-through tax returns.  *Id.* at 129:23–130:18.  King trained Bridgman over one or two partial days by showing her how to complete journal entries and discussing the business licenses with her.  Def.'s SOMF ¶¶ 96–97.  Although Bridgman completed journal entries and filled out paperwork for the business licenses, she remained a government compliance employee throughout her tenure with MBI.  *Id.* ¶¶ 94, 100.  Pirilla joined the tax and government compliance departments in August.

On August 14, 2019, King notified Smay and Davis in an email that she would be taking FMLA leave indefinitely.  *Id.* ¶ 150.  In response, Smay asked her about the status of the indirect tax filings due later that month and about the location of the "P-Card" (a card that MBI used to pay the indirect taxes).  Pl.'s App'x, Ex. 19; Def.'s App'x, Ex. A at 62:20–23.  Davis replied only to Smay, in the same thread, suggesting that they "talk to Balanti [(the Vice President of Human Resources)] in the morning."  Pl.'s App'x, Ex. 19; Pl.'s SOMF ¶ 248.  Smay testified that, given that MBI was planning to let King and Heron go, they needed to discuss how to handle letting King go if she was not going to be in the office.  Def.'s App'x, Ex. A at 63:2–14.

On August 21, 2019, MBI terminated King and Heron.  Def.'s SOMF ¶¶ 130, 132.  King received a call from Smay and an HR representative informing her that her position was being eliminated.  *Id.* ¶ 129.  King also received a letter outlining MBI's policy and informing her that she was being terminated in accordance with that policy.  *Id.* ¶ 130.

### B. Procedural History

King initiated this action against MBI on July 10, 2020.  *See* Compl. (ECF No. 1).  The operative Second Amended Complaint (ECF No. 29) includes four counts: disability discrimination under the ADAA and the PHRA (Count 1); interference with FMLA rights (Count

9

2); age discrimination under the ADEA (Count 3); and retaliation under the ADAA, the PHRA, and the FMLA (Count 4).

On August 30, 2021, MBI filed the pending motion, along with a brief in support (ECF No. 39), a concise statement of facts (ECF No. 40), and an appendix (ECF No. 41). King filed a brief in opposition (ECF No. 45), a response to MBI's concise statement of facts and counterstatement of facts (ECF No. 46), and an appendix (ECF Nos. 47, 48, 49, 50, 51). MBI filed a reply (ECF No. 52), a response to King's counterstatement of facts (ECF No. 53) and a supplemental appendix (ECF No. 54).

## II.   LEGAL STANDARD

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 247–48. Only a dispute over a material fact—that is, a fact that would "affect the outcome of the suit under the governing substantive law"—will preclude the entry of summary judgment. *Id.* at 248.

## III.    DISCUSSION

### A.  King's FMLA Claims

King brings two claims under the FMLA: a claim for interference with her rights (Count 2) and a claim for retaliation for invoking her rights (Count 4).

### 1.  FMLA Retaliation Claim

I begin with King's retaliation claim under the FMLA because its disposition has consequences for the remainder of King's claims. "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Center*, 691 F.3d 294, 301–02 (3d Cir. 2012). "Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law." *Id.* at 302. "Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–77 [109 S.Ct. 1775, 104 L.Ed.2d 268] (1989) (O'Connor, J., concurring)." *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (quoting *Lichtenstein*, 691 F.3d at 302) (alterations in original).

King concedes that the burden shifting analysis prescribed by *McDonnell Douglas* is the appropriate framework to assess her claims.  Mem. of Law in Opp. of Def.'s Mot. for Summ. J. at 9 (ECF No. 45) ("Pl.'s Opp.").  Under that framework:

> a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action.  The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

*Ross*, 755 F.3d at 193 (internal citations omitted).  "The only question . . . is whether [King] is able to meet the shifting burdens of *McDonnell Douglas*."  *Id.*

### a.  *Plaintiff's* prima facie *case of retaliation.*

At the first step, MBI argues that King has no evidence of causation and therefore cannot establish the third element of her *prima facie* case.  As a threshold matter, MBI complains that it is unclear whether King is arguing that she was retaliated against for her first invocation of FMLA leave in March/April, her second invocation in August, or both.  MBI argues that, using either date, King cannot establish causation because she was terminated as part of a reduction in force that preceded even her first invocation of the FMLA.  That reduction in force not only began before King first invoked the FMLA, but also eliminated *both* Tax Manager positions.  And it is undisputed that Heron, the other Tax Manager, was more senior than King, had never taken FMLA leave, and was also terminated at the same time as King.

King responds by pointing to several facts that she asserts raise an inference of causation. Chief among these, King urges that the purportedly conspicuous timing between her first invocation of FMLA leave on March 28 (or April 4, from the perspectives of Davis and Smay) and the early April decision to eliminate her position raises an inference of causation.

I find that a reasonable juror could conclude that King has made out a *prima facie* case of causation based on the timing of the decision to eliminate her position. The Third Circuit has instructed that, in some circumstances, the timing of an adverse employment action (such as MBI's termination of King) can be suggestive of causation. *See LeBoon v. Lancaster Jewish Comm. Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment."); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (noting that the line of cases "that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'") (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon*, 503 F.3d at 233. On the other hand, the Third Circuit has reversed a district court's grant of summary judgment where the plaintiff showed that he was discharged two days after his employer received notice of his EEOC claim. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1998).

Here, a reasonable juror could conclude, based on this record, that MBI decided to terminate King sometime shortly after her March 28 request to go on intermittent FMLA leave. Moreover, the gap of seven days between King's August 14 decision to take indefinite FMLA leave and her August 21 termination could further support an inference of causation. Accordingly, I conclude that King can carry her burden and make a *prima facie* case of retaliation.

*b. Defendant's Legitimate, Non-Discriminatory Reason and Plaintiff's Evidence of Pretext.*

But clearing the first hurdle does not mean that King must succeed in defeating MBI's motion.  Having made a *prima facie* showing, the burden shifts from King to MBI, which must point to a legitimate, non-discriminatory reason for its decision.  MBI offers the restructuring of its tax department, which resulted in the elimination of both Tax Managers, one of whom was more senior and had never taken FMLA leave.  The wheels of that restructuring had begun to turn as early as December of the previous year—long before King first took FMLA leave—when Davis began her review of the finance department.  E&Y, who Davis brought in to assess options for a potential restructuring of MBI's finance department, suggested a new structure that included outsourcing a large portion of MBI's tax compliance work (i.e., tax returns, including the pass-through returns) to E&Y and eliminating the two tax managers.

King does not contest that MBI has proffered a legitimate, non-discriminatory reason for its decision to terminate her, so the burden shifts back to King to show that MBI's proffered reason is pretextual.  "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  "[H]owever, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765.  "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"   *Id.* (internal citations omitted) (alterations and emphasis in original).

As evidence of pretext, King refers to her evidence of causation, i.e., the timing of her termination and her argument that MBI concealed the hybrid position from her and hired Pirilla in her stead.  I begin with King's argument regarding the timing of her termination.  I concluded that King could make out a *prima facie* case of causation on this basis.  However, King has failed to show that MBI's decision to eliminate both Tax Managers as part of a reduction in force is afflicted with "such weaknesses, implausibilities, inconsistencies, or contradictions . . . that a reasonable factfinder *could* rationally find them 'unworthy of credence[.]'"  *Fuentes*, 32 F.3d at 765 (emphasis in original).

The record shows that Davis had begun that process as early as December, nine months before King was terminated and over four months before she first took FMLA leave.  From the outset, Davis indicated that she was interested in the possibility of outsourcing MBI's tax compliance work.  King makes much of the temporal proximity between her first invocation of FMLA leave and the decision to eliminate her position, and at step one of the *McDonnell Douglas* analysis that argument carried weight.  But further inspection reveals that the early April recommendation to eliminate the two Tax Managers came from E&Y, the third party that was assessing MBI's tax department.  E&Y noted the possibility for substantial cost-savings that would result from its proposed restructuring.

Looking to the temporal proximity between King's second request for FMLA leave and her termination supports King's argument no better.  Her termination was the result of a

restructuring process that had been set in motion months earlier.  And, in June, Davis indicated to MBI's owner DC Capital that the restructuring process would be completed in mid-August.  There is not indication that King's decision to take indefinite FMLA leave altered the calculus.

King does point to Smay's July email expressing frustration with King's progress on the July pass-through returns as indicating that he was frustrated with King's absence.  But that email does not, on its own, support a finding of pretext.  Rather, Smay was complaining that the July pass-through returns were delayed.  Nothing in the email or in the record calls that understanding into question.  Indeed, the email does not mention King's leave at all.  Nor does Davis's response raise an inference that Davis and Smay sped up the clock on King's termination, particularly where Davis had indicated to DC Capital a month earlier that she thought the transition would be complete by mid-August.

Second, reviewing the record, I find no evidence supporting King's contention that MBI concealed the senior tax and government compliance analyst position from her.  Nor do I find support for her speculation that she was not offered the position because Smay did not want to have a single direct report who required FMLA leave.  There is unrebutted evidence in the record that the position was created only after Pirilla, who had experience in tax from his time at E&Y, expressed interest in an available government compliance analyst job.  The parties agree that the government compliance job was posted internally sometime in early May.  After the tax analyst job was likewise posted, a decision was made that it would be more efficient to hire Pirilla to fill both roles.  Significantly, Davis testified that the hybrid position likely would not have been created absent Pirilla, who she believed presented MBI with a unique opportunity for added efficiency.

Moreover, there is evidence that King was involved in the search for a tax analyst.  Indeed, she reviewed resumes for that position for Smay and identified three candidates she believed were qualified.  King argues now that she would not have hired Pirilla for the role because he lacked experience and was not a CPA.  But this argument is belied by the fact that none of the candidates she selected when asked to review resumes for the tax analyst position was a CPA.  Further, Smay testified that King would have been overqualified for the position as a tax analyst and Davis testified similarly that the tax analyst role would not be suitable for either King or Heron because it would not include tax compliance work.  There is simply no evidence supporting an inference that MBI conspired to conceal the hybrid position from King.

The tenor of King's argument is that she had better qualifications and much more experience than Pirilla, and thus should have been given the opportunity to apply for the lower-level tax manager job.  But "[a] plaintiff's subjective belief that his qualifications should have been accorded more weight is not probative of pretext."  *Jackson v. Trump Entertainment Resorts, Inc.*, 149 F. Supp. 3d 502, 508 (D.N.J. 2015).  "Of course, a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak."  *Fuentes*, 32 F.3d at 765 n.8.  But King has proffered no evidence that the decision to eliminate her position was the result of anything other than MBI's effort to increase its efficiency by paring down its tax department, a decision made after consultation with a third party.  Nor has she pointed to evidence in the record supporting an inference that MBI concealed the hybrid position from her.  She has thus failed to show pretext as required at step three of the *McDonnell Douglas* analysis.  Accordingly, summary judgment must be granted in favor of MBI on King's FMLA retaliation claim.

### 2. FMLA Interference Claim

Next, I consider King's FMLA interference claim.  To prevail on an interference claim under the FMLA, a plaintiff must prove that "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross*, 755 F.3d at 191–92 (3d Cir. 2014).  "Unlike an FMLA retaliation claim, '[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.'" *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155–56 (3d Cir. 2017) (quoting *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005)) (alteration in original).  "Because the FMLA is not about discrimination, a *McDonnell–Douglas* burden-shifting analysis is not required." *Sommer v. Vanguard Grp.*, 461 F.3d 397, 99 (3d Cir. 2006).

MBI argues that King cannot establish that she was denied any benefit under the FMLA because MBI would have terminated her regardless of her leave as part of the restructuring of the tax department proposed by E&Y.  In response, King points to the April 9 proposal from E&Y, which recommended the elimination of both Tax Manager positions, and the June 13 email from Davis, in which Davis sought approval of the restructuring plan from MBI's ownership.  Both events occurred after King applied for intermittent FMLA leave on March 28.  Therefore, according to King, the decision to terminate her occurred *after* she had applied for intermittent FMLA leave and had the effect of denying her right to that intermittent leave under the FMLA.

I find that King's interference claim fails for two reasons.  First, King's reliance on her first use of FMLA leave in March to predate the decision to terminate her position creates a logical problem for her argument.  King relies on March 28, the date that she requested intermittent FMLA

leave, as the relevant date that she invoked her rights under the FMLA.  She does so, presumably, because this date preceded the April 9 E&Y proposal that recommended the elimination of the two Tax Managers.  But King then requested indefinite FMLA leave on August 14 and was terminated while on that indefinite leave.  King does not explain how she was denied the benefit that she requested on March 28, intermittent leave, when she had requested and begun a separate benefit, indefinite leave, and by necessary implication was no longer taking the intermittent leave she requested in March.

Using either the March or August date on which King invoked her rights under the FMLA, she cannot prevail on her interference claim because she cannot show that she was denied a benefit to which she was entitled.  An employee who takes FMLA leave does not have an absolute right to return to their former (or an equivalent) position where they have been terminated for reasons unrelated to their leave.  The FMLA does provide eligible employees with a right to restoration to their previous position (or an equivalent position) upon their return from FMLA leave:

> (a) Restoration to position
>
> (1) In general
>
> Except as provided in subsection (b), any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—
>
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1).  But that guarantee is cabined by an express statutory limitation that the FMLA does not grant employees on leave additional rights that they would not have had absent the leave:

(3) Limitations

Nothing in this section shall be construed to entitle any restored employee to . . .

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

*Id.* § 2614(a)(3).

"Thus, for example, if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement." *Conoshenti*, 364 F.3d at 141 (citing 29 C.F.R. § 825.216(a)(1)). Of course, the burden remains on the employer to prove "that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." 29 C.F.R. § 825.216(a)(1). But, while an "employer cannot justify its actions by establishing a legitimate business purpose for its decision" to prevail on an interference theory, *Callison*, 430 F.3d at 120, an employer may nonetheless prevail by showing that an employee was "discharged . . . for a reason unrelated to the leave[.]" *Conoshenti*, 364 F.3d at 141.

Here, as discussed in more detail *supra*, MBI has shown that King was terminated because her position was eliminated as part of a restructuring of MBI's tax department. That restructuring began long before King first invoked the FMLA and resulted in the termination of both Tax Managers. The record shows that MBI discharged King as part of the restructuring, a reason unrelated to her leave. Accordingly, summary judgment must be granted in favor of MBI on King's FMLA interference claim. [2]

---

[2] MBI also urges that I should grant judgment in its favor on King's interference claim because it is duplicative of her retaliation claim. The Third Circuit has indicated that plaintiffs may not "have an automatic right to claim interference where . . . the claim is so clearly redundant to the retaliation claim." *Lichtenstein*, 691 F.3d at 312 n.25. And some courts in the Third Circuit have analyzed claims for interference as retaliation claims notwithstanding the plaintiff's choice of frame. *See, e.g.*, *Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) (finding that the

### B. ADA Claims

Next, I must address King's retaliation, discrimination, and failure to accommodate claims under the ADA.

#### 1. ADA Retaliation Claim

I begin with King's ADA retaliation claim because it calls for a substantially identical analysis to that of her FMLA retaliation claim. "A prima facie case of illegal retaliation requires a showing of '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015). The burden-shifting framework of *McDonnell Douglas* applies with equal force to retaliation claims under the ADA. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997) (extending the burden-shifting analysis applied to discrimination claims under Title VII to retaliation claims under the ADA).

King states in her brief that MBI has failed to address her "ADA[] retaliation count," Pl.'s Opp. at 16, but I disagree. The SAC includes only four counts, and King's retaliation claims under the FMLA, the ADA, and the PHRA are all found in Count 4. The conduct underlying the

---

plaintiff's "interference claim is identical to his retaliation claim" and that plaintiff "cannot escape the *McDonnell Douglas* analysis to prove his case merely by affixing an 'interference' label to one of his duplicative claims"); *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 433 ("Since plaintiff's interference claim should be properly characterized as a retaliation claim, the interference claim will be denied as moot in light of the assertion by plaintiff of her retaliation claim.").

There is wisdom in the approach taken by the courts that have treated claims as moot or duplicative when confronted with interference claims that parrot a plaintiff's retaliation claims. That approach would simplify the analysis I have conducted here. However, the Third Circuit has explicitly held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman*, 582 F.3d at 509. In the absence of clearer instruction from the Third Circuit, and because King's interference claim cannot survive summary judgment on its merits, I choose to heed that command. I therefore decline to grant MBI's motion on this basis.

retaliation claims, as recited in the complaint, appears to be identical. *See* SAC ¶¶ 46–50. The best read of the briefs before me, therefore, is that MBI's arguments respecting King's FMLA retaliation claim apply with equal force to King's identical claim under the ADA. Indeed, King seems to assume as much. *See* Pl.'s Opp. at 16 (noting that "Defendant then seems to concede that there was a protected activity and adverse employment action, and the only issue is establishing a causal connection between the protected activity and the adverse employment action"). Moreover, King clarifies in her brief that "[t]he evidence establishing causal connection" for purposes of her ADA retaliation claim is that "discussed earlier in [her] brief on causation and pretext," i.e., the evidence she cited in support of her FMLA claim. *Id.*

I find that summary judgment is appropriate on King's ADA retaliation claim for the same reasons as stated for King's FMLA retaliation claim. The two claims rest on the same conduct and require the same analysis. MBI's arguments respecting the FMLA retaliation claim apply with equal force to the ADA retaliation claim and King relies on the same evidence of causation and pretext. Accordingly, summary judgment must be granted in MBI's favor on King's ADA retaliation claim.

### 2. ADA Discrimination Claim

I next address King's ADA discrimination claim. "In order to make out a prima facie case of disability discrimination under the ADA, [a plaintiff] must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). ADA discrimination claims are analyzed using the *McDonnell Douglas* burden-shifting framework. *See Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667–68 (3d Cir. 1999) ("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA.").

MBI urges that King cannot set forth a *prima facie* case of discrimination because she cannot show that her disability was the cause of her termination.  MBI points out that King testified that she informed individuals at MBI of her disability as early as 2016.  Def.'s App'x, Ex. B at 33:1–12.  And MBI points out that Heron, the other Tax Manager, was also terminated at the same time as King and as part of the same restructuring effort.  MBI also contends that King cannot point to evidence of pretext sufficient to overcome MBI's proffered legitimate, non-discriminatory reason for her termination: the restructuring.

King does not renew her argument regarding the timing of the decision to terminate her position.  Instead, King responds by reiterating her argument regarding Smay.  In her telling, Smay was frustrated with King's disability.  Knowing that he would be going from two direct reports to only one and because of his frustration with her disability, King contends that Smay therefore concealed the restructuring from her, created the hybrid position, and filled that position with Pirilla after posting it for only one day and conducting only one interview.

While the chain of inferences is compelling, none of those inferences are supported by the evidence of record.  As discussed *supra*, the record is clear that in July 2019, Smay expressed frustration with delays to King's completion of the pass-through tax returns.  While Smay's frustration may have been expressed while King was taking intermittent FMLA leave, King offers nothing to support an inference that Smay was frustrated because of her leave (or her disability), rather than the delays that he cited.  Further, as discussed above, the hybrid position was created by combining two positions that had each been posted for some time.  King herself had reviewed resumes for the lower-level tax analyst position in June.  The hybrid position was not concealed from King but was created only after Pirilla applied to one of the open positions, and the record reflects that it was created for him.

Ultimately, I find that King can establish neither a *prima facie* case of discrimination under the ADA, nor that MBI's proffered legitimate non-discriminatory reason was pretextual. A reasonable juror, reviewing the record before me, could not find that King was terminated because of her disability. Nor could a reasonable juror find that MBI's decision to eliminate King's position—along with that of her non-disabled fellow Tax Manager—was pretextual. Accordingly, I must grant summary judgment in favor of MBI on King's ADA discrimination claim.

### 3.   ADA Failure to Accommodate Claim

Finally, I address King's claim for failure to accommodate her disability under the ADA. "A plaintiff bringing an ADA failure-to-accommodate claim must establish: '(1) [s]he was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated.'" *Capps*, 847 F.3d at 157 (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

MBI argues that plaintiff was given the only accommodation that she required, the ability to work from home. I agree. As MBI points out, King testified that she required "the ability to work from home" and that she was working from home two days per week in her current position. Def.'s App'x, Ex. B at 44:1–8. King also testified that she had been working from home one or two days per week since some time in 2016 and that she continued to do so until she was terminated. *Id.* at 36:2–18, 38:1–8. And King testified that she was never denied the ability to work from home when she needed. *Id.* at 144:15–18. Because the record reflects that King was never denied an accommodation, no reasonable juror could conclude that MBI failed to accommodate King's disability.

Nonetheless, King asserts two theories to support her claim for failure to accommodate. First, although not developed (or even mentioned) in her brief, she asserts that she required and

was denied a reasonable leave under the FMLA.  Pl.'s SOMF ¶¶ 165–66.  The Third Circuit has indicated that a request for leave under the FMLA may qualify as a request for a reasonable accommodation, at least in some circumstances.  *Capps*, 847 F.3d at 156–57 ("We recognize that a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA, see 29 C.F.R. § 825.702(c)(2), and to the extent that the District Court held otherwise, that was error.")  However, because she cannot establish that she was denied any benefit to which she was entitled under the FMLA, *see supra*, I find that this theory is unavailing.

Second, King asserts that MBI failed to accommodate her disability by "interfering with her ability to seek reassignment to the senior tax and government compliance analyst position."  Pl.'s Opp. at 17.  Again, King does not develop this theory, which she raises in two sentences in her brief.  King cites *Shapiro v. Township of Lakewood*, 292 F.3d 356 (3d Cir. 2002) for the proposition that "reassignment to an open position that a Plaintiff is otherwise qualified to perform is a form of accommodation[.]"  Pl.'s Opp. at 17.  It is true that *Shapiro* found that an employer's failure to engage in an "interactive process" to reassign a disabled employee to a vacant position may constitute a failure to accommodate in violation of the ADA.  *Shapiro*, 292 F.3d at 359–61.  But *Shapiro* also set forth a two-step analysis requiring a threshold showing by the employee that "the accommodation is a type that is reasonable in the run of cases."  *Id.* at 361.  Here, King has not even attempted to make such a showing.  Therefore, I find that this theory is also unavailing.  Accordingly, I must grant summary judgment in favor of MBI.

### C. Age Discrimination Claim

In her brief, King abandoned her claim for age discrimination under the ADEA.  Pl.'s Opp. at 17.  Accordingly, I must grant summary judgment in favor of MBI on King's age discrimination claim under the ADEA.

### D.  State Law Claims

The Third Circuit has instructed that "where the claim over which the district has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).  Neither party has advanced an argument as to why supplemental jurisdiction over King's state law claims is proper here in the absence of King's federal claims.  Accordingly, those claims will be dismissed without prejudice for lack of subject-matter jurisdiction.

## IV.   CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (ECF No. 38) will be GRANTED and judgment will be entered in favor of the defendant, MBI, on King's claims under the FMLA, the ADA, and the ADEA.  Further, King's claims under the PHRA will be dismissed without prejudice.  An appropriate Order follows.

BY THE COURT:

s/  Robert J. Colville
Robert J. Colville
United States District Judge

DATED: July 8, 2022

cc: All counsel of record